# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| TERESA E. BANKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:12-00596 |
| ) | Judge Sharp |
| ) | |
| ARGOS RISK MANAGEMENT ) | |
| SERVICES, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This is a wrongful termination case which arose after Plaintiff Teresa E. Banks was dismissed from her employment after filing a workers' compensation claim. Defendant Argos Risk Management Services, LLC has filed a Motion for Summary Judgment (Docket No. 18), to which Plaintiff has responded in opposition (Docket No. 20), and Defendant has replied (Docket No. 23). For the following reasons, the Motion for Summary Judgment will be granted.

## I. FACTUAL BACKGROUND

So far as relevant, the underlying facts (many of which are undisputed) are as follows:

Argos is a third-party administrator of workers' compensation claims, meaning that it manages such claims for its clients, including insurance companies and their insured. Headquartered in Birmingham, Alabama, Argos maintains an office in Brentwood, Tennessee, where, during the relevant time period, three or four individuals were employed.

Argos maintains an employee handbook containing an anti-discrimination policy. The handbook also includes an "Honesty and Integrity" provision that states, "[e]mployees are expected

1

to demonstrate honesty and professionalism in the conduct of all business activities. . ." and lists "[f]alsification of records or documents (including time records, job applications, absence reports, expense accounts, and other business records)" as examples of "unacceptable" actions.

In October 2010, Argos posted a Claims Adjuster III position for the Brentwood office on Career Builder, an internet recruiting website. A Claims Adjuster III is a high level position, one that requires good judgment and trust, because those in the position are responsible for distributing large sums of money to Argos' clients, and making decisions regarding whether employees receive workers' compensation benefits. The position generally requires a minimum of five (5) years continuous employment in a position responsible for the overall handling of workers' compensation claims.[1]

On November 17, 2010, Plaintiff responded to the ad by sending an email that included a "professional profile" and her resume. Plaintiff's profile indicated she was a "[r]esult oriented and conscientious insurance professional with 12 years in the insurance industry especially multi-state experience managing Workers' Compensation claims from date of injury through litigation." It also stated Plaintiff had "field experience with regards to investigating accident sites, interviewing claimants and insureds for fraud and compensability in TN, AL and GA."

In her resume, Plaintiff indicated that she was currently employed by the State of Tennessee as a Benefits Analyst in the Department of Finance & Administration. The resume also indicated that she was employed by Amerisafe Risk Services from November 2005 to August 2008 as a "Field Case Manager/Claims Examiner," and left that position due to travel. Additionally, the resume further represented that Plaintiff had been employed by American International Group ("AIG") as a "Workers'

---

[1] This is an unwritten requirement, and it is possible that an individual with four years of significant experience as a worker's compensation supervisor for a large firm might be considered for the position.

Compensation Disability Specialist" from July 1998 to March 2005, responsible for "Disability and Catastrophic Claims Management."

On December 6, 2010, Plaintiff was interviewed by Ivan Gunn, the Claims Supervisor of the Brentwood office. That same day, Plaintiff completed Argos' employment application.[2] The employment application includes the question, "Have you received any written reprimands or disciplinary suspensions during your previous employment, been discharged or asked to resign?", to which Plaintiff responded, "No." The application also asks an applicant to list his or her previous employers and attach additional pages, "if necessary to list all additional employers."

On her employment application, Plaintiff stated that she was employed by the State of Tennessee from September 2009 to the present as a Benefits Analyst. In response to the question as to her reason for leaving, Plaintiff wrote, "still there," and Plaintiff listed a current annual salary of $35,000.00.

Plaintiff also indicated that she had been employed by Amerisafe Risk Services from November 2005 to August 2008 as a Field Case Manager, and that she left so that she could "stop traveling."[3] Plaintiff stated she was employed by AIG from July 1998 to March 2005 as a Disability Specialist. Plaintiff signed the last page of her employment application, certifying that it was true to the best of her knowledge and belief. Argos did not verify Plaintiff's employment, or contact her professional references at that time.

After interviewing Plaintiff, Gunn told Jan Peine, the Claims Manager located in Birmingham

---

[2] Plaintiff claims that she was instructed by Gunn to make sure that her application matched her resume.

[3] In her deposition, Plaintiff testified that she told Gunn she was asked to leave "due to a conflict of interest policy violation," but that she also wanted to leave because she was tired of traveling.

that Plaintiff "looked good," and asked if it was "okay" to hire her. Upon reviewing Plaintiff's resume, both Jan Peine and Todd Larry, President and Chief Executive Officer of Argos believed Plaintiff had been employed by AIG for seven (7) years in a position handling workers' compensation claims and that she was currently employed by the State of Tennessee. Based upon Plaintiff's representations about her work history, Gunn was given the go ahead to hire Plaintiff, and she was hired on December 13, 2010.

In November of each year, Argos undertakes an Annual Performance Review that assigns a numerical score to an employee's job performance, based upon such things as work conduct behavior, demeanor, record of attendance, and goal accomplishment. The numerical score serves as the basis for bonuses. On November 8, 2011, Plaintiff received a "very good evaluation" with a numerical score of 37 out of 43 and received a bonus as a result.

Also in November of each year, Peine conducts an audit of pending workers' compensation files, including the reserves set for open claims. Upon reviewing Plaintiff's files, Peine was alarmed to find that the first three she reviewed had unusually low reserves set in light of the ongoing medical treatment and issues involved in the claims. Peine considered the failure to have adequate reserves a "rookie mistake."

As a consequence, and before Plaintiff received her evaluation, Peine sent Plaintiff emails about errors with her reserves and coached Plaintiff about the need for Plaintiff to adequately set reserves consistent with the claim specifics. Thereafter, Plaintiff approached Gunn, complaining about Peine's emails, and asking why Peine was "picking on her." Gunn reminded Plaintiff that it was Peine's job to routinely audit open workers' compensation files and that she was not "picking" on Plaintiff.

4

On November 8, 2011, and shortly after Peine's emails, Plaintiff claims that she was injured in a workplace accident. This allegedly occurred while she was seated at her desk, and an overhead filing cabinet door fell on her hand. Gunn completed the required incident report and submitted it to Peine, who is responsible, among other things, for administering workers' compensation claims for Argos employees. In reporting the incident, Gunn wrote that it was "unwitnessed," that "everyone hear [sic] heard the noise and her moaning," and that he walked into her office to see if she was all right and she "just said it hurts."

The report of the incident raised "red flags" for Peine, particularly because the accident was not witnessed, and Plaintiff was "moaning and groaning." Additionally, Peine tried to recreate the accident at her own, identical desk, but could not do so. She did not contact Plaintiff and ask her about the incident.

As is her custom, Peine began an investigation, and, in doing so, ran an "Index" (an electronic report of claims information provided by various insurance companies), utilizing Plaintiff's social security number. This resulted in the discovery of numerous prior claims by Plaintiff, and Peine was of the opinion that she was a "professional claimant."[4]

Peine then hired an outside investigator to gather additional background information. During the investigation, Peine was the individual responsible for coordinating Plaintiff's medical treatment for her workers' compensation claim.

Through the investigation, Peine learned that Plaintiff had filed bankruptcy on or about

---

[4] It is unclear whether Peine discovered problems with Plaintiff's employment history when she consulted the Index. At one point in her deposition, she seemed to indicate that she did not, but later stated that she noticed Plaintiff had filed a claim against an employer other than AIG at a time she was supposed to have been working for AIG.

November 3, 2010, shortly before her interview with Argos. The bankruptcy pleading indicated that, as of the time of filing, Plaintiff was employed by Genco Distribution Systems, rather than the State of Tennessee as Plaintiff had indicated in her resume and employment application, and Genco had not been listed as a prior employer.

Sometime in late November or early December 2011, Peine reported to Larry that, based upon the Index, Plaintiff was "trouble," inasmuch as she had filed numerous prior workers' compensation claims. Peine also reported that the bankruptcy pleadings showed Plaintiff was not working for the State of Tennessee when she applied for the Claims Adjuster III position at Argos. This apparent misrepresentation in Plaintiff's application and resume concerned Larry because he expected employees to be honest. Larry instructed Peine to check Plaintiff's employment references to see if her representations about prior work experience were accurate.

Peine did as instructed, and sought to verify Plaintiff's other employment history as detailed on her employment application materials. On February 13, 2012, Peine submitted an employment verification to AIG via facsimile. The following day, AIG responded and stated that Plaintiff had been employed for less than three years as a Claims Clerk II. At this time, Defendant did not know what the actual duties of a Claims Clerk II at AIG were, but, based upon her extensive experience in the field, Peine understood that a "Claims Clerk" was a lower level, non-professional position that did not handle catastrophic loss claims.

A couple of weeks before Peine requested confirmation from AIG, she learned (on or about February 2, 2012) that Plaintiff might have to undergo total reconstructive shoulder surgery.

Based upon Plaintiff's bankruptcy documents and AIG's employment verification, Larry believed that Plaintiff had falsified her employment application materials, i.e. her resume and

6

application, and was not trustworthy. He also did not believe Plaintiff had the requisite employment experience to qualify her for the Claims Adjuster III position. As a result, he decided that Plaintiff's employment with Argos should be terminated. The decision to terminate Plaintiff was made by Larry, although Peine recommended termination. Gunn did not participate in the decision.

Even though the decision to terminate Plaintiff was made on February 14, 2012, Defendant did not act on its decision but instead permitted Plaintiff to work while it continued to investigate Plaintiff's worker' compensation claim and sought the advice of counsel. On March 5, 2012 Plaintiff was summoned to Argos' lawyer's office and deposed about her work, and personal and workers' compensation claims history. At the conclusion of the deposition, Peine told Plaintiff that she was terminated because she was not qualified for the Claims Adjuster III position. At the same time, Argos offered to settle Plaintiff's workers' compensation claim for a nominal amount.

At the time of the firing, Argos did not know what Plaintiff's actual job duties were at AIG,[5] Argos did not know whether Plaintiff had performed prior field managing work, whether Plaintiff did disability specializing work at AIG, or whether she had done any benefit analyzing at the State of Tennessee. It did know, however, that Plaintiff had indisputably lied on her application for employment.

## II. APPLICATION OF LAW

Plaintiff brings only state law claims, including a retaliation claim, and a claim for outrageous

---

[5] Larry only knew that Plaintiff had been a "Clerk" at AIG. As it turns out, Plaintiff worked in the mail room at AIG and in customer service, answering the telephone. Further, from 1998 to 2000, at a time when Plaintiff was supposedly working for AIG, she worked on and off part time for Courier Express as a mail courier where she picked up mail from the post office and delivered it to AIG and other companies that contacted with Courier Express.

conduct. She has failed to establish a triable jury issue with respect to either claim.

## A. **Retaliation Claim**

Tennessee is an at-will employment state meaning that, as a general proposition, an employer may terminate an employee for good reason, bad reason, or no reason at all. Franklin v. Swift Transp. Co., Inc., 210 S.W.3d 521, 526 (Tenn. Ct. App. 2006). However, "the traditional at-will rule is not absolute; restrictions have been imposed upon the right of an employer to terminate an employee when the employee is discharged in contravention of well-defined and established public policy," Guy v. Mutual of Omaha Ins. Co., 79 S.W.3d 528, 534 (Tenn. 2002), and this includes discharging an employee because he or she exercises rights under the workers' compensation statute. Clanton v. Cain–Sloan Co., 677 S.W.2d 441, 445 (Tenn. 1984). It also includes prohibiting the "discharge by a subsequent employer of an employee who filed a workers' compensation claim against a previous employer." Hayes v. Computer Sciences Corp., 2003 WL 11347 at *2 (Tenn. Ct. App. 2003).[6]

In analyzing such claims, the Court utilizes the well-established burden shifting method under which the burden of production shifts, but the ultimate burden of persuasion always lies with Plaintiff. To establish a *prima facie* case, Plaintiff must show that "(1) [she] was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff' employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment." Anderson v. Std. Register Corp., 857 S.W.2d 555, 558 (Tenn. 1993). "If

---

[6] The Court disagrees with Argos's assertion that Plaintiff's summary judgment arguments about retaliation based upon claims with previous employers is beyond the scope of her Complaint. Even though Plaintiff may not have set out the specifics of those prior claims, she does allege generally that she was retaliated against because she exercised her rights under the workers' compensation laws.

8

[the plaintiff] succeeds in showing each of these four elements, [s]he has made out a *prima facie* case of retaliatory discharge," and "[t]he burden then shifts to [the defendant] to articulate a legitimate, non-retaliatory reason for the discharge." Thayer v. Tyson Foods, Inc., 355 Fed. App'x 886, 889 (6th Cir. 2009).[7]

In this case, there is no dispute that Plaintiff has established the first three elements of a *prima facie* case, or that Argos has set forth a legitimate non-discriminatory reason for terminating her employment. Thus, the Court focuses on whether Plaintiff has established that the exercise of her rights under the workers' compensation laws was a substantial factor in her dismissal, and, if so, whether Argos stated, non-retaliatory reason is, in reality, a pretext for retaliation.

With regard to the fourth element, Plaintiff argues that the temporal proximity is such that a reasonable jury can find causation, that is, a substantial factor in her termination was her pursuit of a workers' compensation claim. She also argues that causation is established via a cat's paw theory based upon Peine's alleged hostility towards Plaintiff because she filed numerous workers' compensation claims against other employers. While the Court agrees that there is sufficient evidence of causation based upon temporal proximity, the Court finds insufficient evidence to establish cat's paw liability.

"Where an adverse employment action occurs very close in time after an employer learns of

---

[7] The Court notes that, in Gossett v. Tractor Supply Co., 320 S.W.3d 777, 781–86 (Tenn.2010), a common law retaliatory discharge case, the Tennessee Supreme Court determined that the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) was inconsistent with Tennessee's summary judgment standards. However, Gossett's holding has been treated by federal courts as a matter of state procedural law and hence inapplicable to motions brought under Rule 56 of the Federal Rules of Civil Procedure. See, Theus v. GlaxoSmithKline, 452 Fed. App'x 596, 602 n. 8 (6th Cir. 2011). Additionally, Gossett was effectively abrogated by Tennessee Code Annotated §§ 4–21–311(e) and § 50-1-304(g), at least with respect to discrimination and retaliation claims brought under the Tennessee Human Rights Act. In any event, both parties in this case rely on the burden shifting approach.

9

a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Id.

In this case, the approximately four month period between the time the injury was reported and the termination, standing alone, might not be sufficient to create an inference that the decision to terminate was causally related to the report of injury. See, Blosser v. AK Steel Corp., 2013 WL 1316344 at *3 (6th Cir. April 2, 2013) (four month period between taking of medical leave and termination not sufficient by itself to show causation); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that [plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation."). However, evidence that an employee was singled out, or subjected to increased scrutiny can be considered in the causation equation. Hamilton v. Gen. Elec. Co., 556 F.3d 428, 436 (6th Cir. 2009). Likewise, "a pattern of antagonism following a complaint . . . [is] relevant to the determination of causation." Allen v. McPhee, 240 S.W. 3d 803, 823 (Tenn. 2007).

A reasonable jury could find, under the facts of this case, that Peine was antagonistic towards Plaintiff, because she viewed her as a "professional claimant," scrutinized her claim, attempted to recreate it, and subsequently hiring a private investigator to look into Plaintiff's past. Moreover, the record shows that, at the beginning of February 2013, Peine learned that Plaintiff might have to undergo total reconstructive shoulder surgery and, within two weeks thereafter, Plaintiff was

terminated. This is sufficient to establish causation and the fourth element of the *prima facie* case.

Plaintiff also argues that she has established causation under the "cat's paw theory" of liability. This theory, which may be direct evidence of discrimination or retaliation, Romans v. Michigan Dept. of Human Services, 668 F.3d 826, 837 (6th Cir. 2012), "refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse decision, thereby hiding the subordinate's discriminatory intent." Cobbins v. Tenn. Dep't of Transp., 566 F.3d 582, 586 n. 5 (6th Cir. 2009). Under the theory, Plaintiff must show that "by relying on this discriminatory information flow, the ultimate decision maker acted as the conduit of the supervisor's prejudice – his cat's paw." Madden v. Chattanooga City Wide Serv. Dep't, 549 F.3d 666, 677 (6th Cir. 2008).

In Staub v. Proctor Hospital, 131 S.Ct. 1186, 1194 (2011) the Supreme Court stated that "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable[.]" The Court also observed:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

Id. at 1193. Thus, under Staub, animus can be imputed to the decisionmaker where plaintiff can show (1) the non-decisionmaker intended to cause an adverse employment action, and (2) the non-decisionmaker's discriminatory action is a proximate cause of the ultimate employment action, both of which may present jury questions. Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 351 n.10 (6th Cir. 2012).

11

However, "mere knowledge" of, or speculation about, a "contaminated perception" is insufficient to establish a causal connection. Noble v. Brinker Intern., Inc., 391 F.3d 715, 723 -724 (6th Cir. 2004). Moreover, "when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." Roberts v. Principi, 283 Fed. App'x 435, 433 (6th Cir. 2008). This is because, "[b]y making the decision based on an independent investigation, the decisionmaker confirms that he is acting as a true agent of the employer and not a mere conduit of the subordinate." Id. Likewise, the causal connection between the supervisor's bias and the adverse employment action may be severed where the decision is based upon an "undisputed event." Davis v. Omni-Care, Inc., 482 Fed. App'x 102, 110 (6th Cir. 2012).

Assuming Peine believed that Plaintiff should have been terminated because she filed several workers' compensation claims (including the one against Argos) as opposed to being fired because she lied, Plaintiff has failed to show, under a cat's paw theory, that Peine's alleged antagonism should be imputed to Larry. After reviewing the Index, Peine reported to Larry that Plaintiff was "trouble" because of her filing numerous claims against several prior employers, but Larry did not dismiss Plaintiff at that time. Nor did he fire Plaintiff when he learned that the bankruptcy pleadings suggested that Plaintiff may have misrepresented her prior employment with the State of Tennessee; rather, he instructed Peine to look further into Plaintiff's prior employment history. Larry only decided to terminate Plaintiff after AIG reported that she had worked there for a period substantially less than Plaintiff claimed, and in a position different than that which she represented on her resume. Even though Larry did not conduct his own investigation, he did not simply rely upon what Peine reported, but rather acted on an "undisputed event," to wit, AIG's verification of Plaintiff's employment.

Simply put, Larry was not Peine's cat's paw.

Turning to the issue of pretext, pretext may be shown by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004). With respect to these avenues of proof, the Sixth Circuit has stated:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or a coverup.

Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1994).

Plaintiff cannot show that the stated reason for her termination is false, because she indisputably lied, and blatantly so, on her application. Nor can she show that dishonesty by an employee in a position of trust is insufficient to warrant termination. Plaintiff is left with arguing that the given reason did not actually motivate her termination, that is, the "sheer weight of the

13

circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or a coverup." Manzer, 29 F.3d at 1084.

Aside from arguing that Peine was hell-bent on firing Plaintiff because she was a "professional claimant" – a predilection that, if true, the Court finds should not be imputed to Larry – Plaintiff raises two general arguments regarding pretext. First, she argues that Argos offered changing reasons for firing her. Second, Plaintiff argues that Argos did not know whether she was actually qualified for the Claims Adjuster III position.

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext," Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir. 1996), because "[s]hifting justifications over time calls the credibility of those justifications into question." Cicero v. Borg–Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir. 2002). However, "'[[t]he extent to which such shifting justifications are probative of pretext depends upon the circumstances of a given case' and the magnitude of the inconsistency." Aldridge v. City of Memphis, 404 Fed. App'x 29, 38-9 (6th Cir. 2010) (quoting, Eades v. Brookdale Senior Living, Inc., 401 Fed. App'x 8, 13 (6th Cir. 2010)). Further, "[b]oth [the Sixth] Circuit and others have recognized that providing *additional* non-discriminatory reasons that do not conflict with the one stated at time of discharge does not constitute shifting justifications." MacDonald-Bass v. J.E. Johnson Contracting, Inc., 493 Fed. App'x 718, 727 (6th Cir. 2012) (emphasis in original, collecting cases).

Here, the fact that Peine told Plaintiff that she was fired because she was not qualified to be a Claims Adjuster III does not conflict with Larry's assertion that Plaintiff was fired because she lied on her resume. The undisputed evidence is that Plaintiff was hired based on the misrepresentations she made in her resume, misrepresentations that made her appear qualified when she was not.

14

Plaintiff's argument that Argos did not know her actual qualifications and thus could not have fired her because she was deemed unqualified is without merit. Both Peine and Larry knew for a fact that Plaintiff had worked for AIG for three years as a Claims Clerk II, not as a Workers' Compensation Disability Specialist for close to seven years, as she claimed. Additionally, Peine knew that the duties of a claims clerk were nothing like those of a claims adjuster, a conclusion that was subsequently borne out by the evidence in this case that Plaintiff answered phones and worked in the mailroom at AIG.

The fact that Gunn rated Plaintiff's overall work as "very good" does not alter this conclusion. Leaving aside that Gunn was not involved in the termination decision, his positive evaluation does not make it probable that Argos lacked a good faith reason to believe that Plaintiff was unqualified to be a Claims Adjuster III, or excuse the fact that she lied in her resume and on her application.

In Peine's annual review of the pending workers' compensation files (which would have been the first such review of Plaintiff's cases), Peine immediately discovered files that had insufficient reserves, something which she deemed to be a rookie mistake. These deficiencies were brought to Plaintiff's attention just days before she allegedly injured her hand at work.

Further, Plaintiff does not (and cannot) dispute that she was hired based upon her false representation that she had worked for seven years at AIG as a Workers' Compensation Disability Specialist, responsible for "Disability and Catastrophic Claims Management." Because the evidence which has been produced establishes that she was fired for making that (and other) false representations on her resume, and that those misrepresentations appeared to make her qualified when she was not, Plaintiff has not shown pretext and Argos is entitled to summary judgment on the retaliation claim.

**B. Outrageous Conduct**

The tort of outrageous conduct, also known as the intentional infliction of emotional distress, has three elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). "Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Bain, 936 S.W.2d at 622. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" Id. at 623.

Plaintiff has proffered nothing to support her outrageous conduct claim, and she made no effort even to respond to Argos's motion on this issue. Nothing in her allegation could lead a reasonable person to proclaim that Argos's treatment of her was outrageous, and, accordingly, summary judgment is appropriate on this claim as well.

### III. CONCLUSION

On the basis of the foregoing, the Court will enter an Order granting Argos's Motion for Summary Judgment.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE